# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Amber Geohaghan, Appellant,

v.

South Carolina Department of Employment and Workforce and South Carolina Department of Social Services, Respondents.

Appellate Case No. 2019-000995

―――――――

Appeal From The Administrative Law Court
Shirley C. Robinson, Administrative Law Judge

―――――――

Opinion No. 5967
Heard April 14, 2022 – Filed February 1, 2023

―――――――

## AFFIRMED

―――――――

Adam Protheroe, of South Carolina Appleseed Legal Justice Center, of Columbia, for Appellant.

Eugene Hamilton Matthews, of Richardson Plowden & Robinson, PA, of Columbia, for Respondent South Carolina Department of Social Services.

Todd Stuart Timmons and Benjamin Thomas Cook, both of Columbia, for Respondent South Carolina Department of Employment and Workforce.

―――――――

**VINSON, J.:** Amber Geohaghan appeals the Administrative Law Court's (the ALC's) order affirming the South Carolina Department of Employment and

Workforce's (the Department's) final decision determining Geohaghan was indefinitely ineligible for receipt of unemployment benefits.  Geohaghan argues the ALC erred (1) in holding the question of whether she had good cause to resign was a question of fact subject to substantial evidence review and (2) in affirming the Department's finding she resigned without good cause when that finding was not supported by substantial evidence.  We affirm.

## FACTS AND PROCEDURAL HISTORY

Geohaghan began working for the South Carolina Department of Social Services (DSS) in March 2013.  On or about March 2, 2018, Geohaghan resigned, effective March 16, 2018, and she filed for unemployment benefits on March 9, 2018.  In response to the Department's fact-finding questionnaire, Geohaghan stated the reason she gave DSS for resigning was that the "change [would] be beneficial to [her] long-term career goals and objectives."  Whereas the reason she gave on the questionnaire for her resignation was an incident that occurred on January 31, 2018, involving verbal threats made to her by a client (the Client).  Following a review of her claim, the Department's claims adjudicator found that, effective March 18, 2018, Geohaghan was indefinitely ineligible for unemployment benefits because there were no significant changes to her working conditions and she left her position voluntarily without good cause.  Geohaghan appealed this decision to the Department's Appeal Tribunal.

In support of her appeal, Geohaghan provided the Appeal Tribunal with a copy of an email she sent to her Human Resources (HR) liaison, Cynthia Brown, on February 12, 2018, and a letter addressed to the Appeal Tribunal explaining the circumstances of the January 31 incident in more detail.  In the email, Geohaghan alleged the Client "verbally attacked" her by calling her a derogatory term and "stupid."  She noted a DSS staff member informed her the Client "made a comment about a gun" while being escorted out of the DSS building.  Geohaghan indicated she had not had any further contact with the Client since the January 31 incident, but expressed concern for her safety if she were required to conduct future face-to-face visits with the Client at the Client's home.  Geohaghan stated she had reason to believe the Client owned a firearm and she believed it was in the best interest of the Client for Brown to assign a new caseworker to the Client's case.

In her letter to the Appeal Tribunal, Geohaghan framed the Client's statement about a gun as a threat directed toward her.  Geohaghan stated her direct supervisor, Gwendolyn Breeland, told her "to not follow '[the Client] up'" and that the Client was "all bark no bite."  She explained Breeland asked another caseworker to take

the Client's case, but the caseworker refused.  Geohaghan questioned whether DSS took appropriate action in notifying the agency director and the state office.

The Appeal Tribunal held a telephonic evidentiary hearing on June 8, 2018.  During the hearing, Geohaghan maintained the sole reason for her resignation was the January 31 incident.  She explained the incident arose out of a contentious family meeting with the Client.  According to Geohaghan, when security became involved, the Client called her a "bitch," said she was stupid, and requested a new case manager.  As Geohaghan removed herself from the situation, the Client continued to scream loudly and stated, "You better be glad I don't have my gun," which Geohaghan perceived as being directed at her because she was the Client's case manager.  Geohaghan's DSS performance coach directed her to remove herself from the situation after the Client made the comment about the gun.  Geohaghan explained she was afraid of the Client because the Client had threatened to confront one of her own family members with a gun four days prior.  Security informed Geohaghan that the Client would not be allowed on the premises for the time being, but it was unclear to Geohaghan how long the ban would continue.  Brown and Breeland were both present for the January 31 incident.  Brown told Geohaghan she would notify the DSS county director and the state office, as required under DSS policy, and instructed all of the witnesses to provide a statement.

Geohaghan later discussed the incident with Breeland and raised her concerns about continuing as the Client's case manager, including fears about her safety.  She specifically asked Breeland to reassign the Client's case to avoid any contact with the Client on visits; however, the caseworker Breeland approached declined the assignment based on the Client's behavior.  Geohaghan reiterated that Breeland and other employees assured her the Client was "all bark, no bite."  After discussing her concerns with Brown and Breeland, she did not receive any "feedback" or an update on the matter.  Geohaghan was not instructed to interact with the Client but based on the lack of feedback she received, she believed she would still be responsible for conducting home visits with the Client.  Geohaghan stated "nothing happened" between February 12 and her resignation and she did not have any contact with the Client after the January 31 incident.  She added that she made Brown aware she had not contacted the Client during that time and she "did not get penalized . . . for that.  But [she] did not get any feedback."

Geohaghan did not contact Brown or HR after her February 12 email to Breeland, nor did she contact state-level HR or the state office.  Geohaghan specifically named the individual at the state office she could have contacted and did, in fact,

contact in preparation for the hearing. She explained she did not reach out to anyone before resigning because she believed DSS would not take any further action. Geohaghan acknowledged she did not know the process for handling her complaint or the timeframe in which DSS was required to complete its investigation.

When asked what prompted her to resign, Geohaghan responded it was due to the upward trend in gun violence, including an incident that occurred in another DSS county office in 1994, and her concern that DSS was not addressing the January 31 incident. Subsequently, Geohaghan added she resigned because she felt as though Brown had not adequately addressed her concerns about her safety and she had not received any "feedback." Geohaghan stated that had she not resigned, she would still have been employed.

Brown testified the Client used profanity and acted in an "irate" manner during the January 31 incident but she did not hear the Client make a threat about a gun. Brown requested that everyone who witnessed the incident draft a statement for her to provide to the appropriate personnel. After receiving all of the statements in April 2018, Brown contacted DSS's central HR employee relations unit and submitted the statements to the critical response office. Brown testified she followed all the proper protocols in gathering the witness statements but she did not give the time frame in which she was required to notify critical response. She met with the critical response program coordinator, who told her she would handle the matter from that point forward. Brown confirmed that while the investigation was ongoing, the Client would not be allowed on DSS premises and that the Client was eventually served with a notice of no trespassing in April 2018.

When asked what an employee could do in a situation like Geohaghan's, Brown explained an employee could submit an agency complaint, which required the employee to go through their chain of command. Because Breeland was the acting program coordinator, Brown stated Geohaghan should have reached out to the regional administrator, who was the interim county director. Furthermore, Brown stated that if Breeland or the interim county director were unresponsive, Geohaghan should have notified her or directly contacted DSS's central HR employee relations manager or director. When asked how she would have assisted Geohaghan had she notified her prior to her resignation, Brown stated she would have sought guidance from DSS's central employee relations unit. Brown was unaware whether it was normal protocol to require Geohaghan to meet with a client in this situation but as a supervisor, if one of her staff were threatened, then she would not expect them to conduct monthly visits.

Nicole Foulks, the DSS regional director and interim county director, was unable to recall if Geohaghan contacted her about the January 31 incident or her concerns about the alleged inaction by her supervisors. Had Geohaghan contacted her, Foulks explained there were several things she could have done to assist Geohaghan, such as additional training, pairing her with another employee to handle the Client's case, or reassignment of the case. She stated the particular course of action would have been determined on a case-by-case basis. When asked whether Geohaghan would have been held accountable for not meeting with the Client, Foulks responded she would have been held accountable, but only if a plan assisting Geohaghan had already been implemented. However, Foulks did not know whether a plan had ever been put in place for Geohaghan.

The Appeal Tribunal affirmed the claims adjudicator's decision, finding Geohaghan voluntarily quit without good cause. The Appeal Tribunal defined "good cause" as used in section 41-35-120(1) of the South Carolina Code (2021)[1] as "a material, substantial change in the conditions of employment, or other circumstances directly attributable to the employment, which would cause a reasonable person to become totally unemployed rather than continue working." Although the Appeal Tribunal found Geohaghan's concerns about her safety were justified, it nevertheless determined that "[t]he circumstances would not cause a reasonable person to become totally unemployed rather than continue working, given the time and distance from the precipitating incident and the additional options available to [Geohaghan] to have [DSS] further address her concerns." Geohaghan appealed the Appeal Tribunal's decision to the Department's Appellate Panel. The Appellate Panel affirmed the Appeal Tribunal's decision, restating the Appeal Tribunal's definition of good cause and finding Geohaghan failed to present "specific credible evidence of circumstances directly attributable to the employment which would cause a reasonable person to become totally unemployed rather than continue working."

Geohaghan appealed the Appellate Panel's decision to the ALC. In her ALC brief, Geohaghan included a paragraph in her argument section addressing the meaning of good cause under section 41-35-120(1); it read:

> An employee who leaves employment voluntarily and
> without good cause is disqualified from receiving

---

[1] Section 41-35-120(1) provides "[a]n insured worker is ineligible for benefits . . . [i]f the [D]epartment finds he left voluntarily, without good cause."

unemployment benefits.  S.C. Code Ann. § 41-35-120(1). "To constitute good cause, the circumstances which lead an employee to leave the job must be such as would cause a reasonable person to leave."  76 Am. Jur. 2d *Unemployment Compensation* § 102[ (2005)].  Good cause to leave must, generally, be attributable to or connected with the claimant's employment.  *See* [*Stone Mfg. Co. v. S.C. Emp. Sec. Comm'n*, 219 S.C. 239, 64 S.E.2d 644 (1951)].

Geohaghan argued, "Here, it is undisputed that the events [that] caused [her] to resign were attributable to or connected with her employment at DSS.  Therefore, the question presented in this case is whether [her] decision to resign in lieu of placing her life in jeopardy was reasonable."  She further argued the Department "misapplied the good cause standard contained in [section] 41-35-120(1) and relied upon findings which were irrelevant or unsupported by the record" in finding her decision to resign was unreasonable.

Geohaghan asserted South Carolina appellate courts had not addressed the specific situation presented in her case—"a threat of lethal violence against [Geohaghan] under circumstances where [her] fear for her safety was clearly justified."  She cited to *Scott v. Butler*,[2] a Georgia Court of Appeals decision, for the proposition that "whe[n] an employee is unnecessarily exposed to the actual threat of violence due to circumstances entirely beyond their control, voluntary resignation would be with due cause *as a matter of law*."  Geohaghan contended section 41-35-710 of the South Carolina Code (2010)[3] did not independently support the conclusion that the question of whether an employee left work voluntarily and with good cause was a question of fact and several states "have recognized that the question of whether an employee had good cause to resign is, to some degree, a question of law."  She claimed the ALC therefore need not defer to the Department's finding she lacked good cause to resign.  Geohaghan cited to additional case law from other jurisdictions to support her proposition that threats of physical violence "may" constitute good cause for resignation.

---

[2] 759 S.E.2d 545 (Ga. Ct. App. 2014).
[3] Section 41-35-710 states the Department "may on its own motion affirm, modify, or set aside a decision of an appeal tribunal on the basis of evidence previously submitted in the case; direct the taking of additional evidence; or permit a party to the decision to initiate further appeals before it."

Geohaghan concluded two propositions supported her claim of entitlement to unemployment benefits: (1) "whether an employee has good cause to resign is, to some degree, a question of law" and as a result, the ALC need not defer to the Department's findings and (2) "threats of physical violence may constitute good cause to resign." She also challenged five of the Department's factual findings as being irrelevant or not supported by the record. In her reply, Geohaghan stated "whether [she] had good cause to resign is, as numerous courts have recognized, a question of law"; however, in her conclusion, Geohaghan again argued her decision to resign was reasonable.

The ALC affirmed the Appellate Panel's decision without oral argument. In its order, the ALC did not address Geohaghan's argument that whether an employee had good cause to resign was a question of law but found substantial evidence supported the Appellate Panel's finding Geohaghan voluntarily left employment without good cause. The ALC did however include a section addressing the definition of good cause under section 41-35-120(1). It stated:

> Good cause means "attributable to or connected with the employment." [*Stone Mfg. Co.*, 219 S.C. at 247, 64 S.E.2d at 647]. A claimant who terminates their employment voluntarily for good cause has the burden of proof on that issue. 81 C.J.S. *Social Security and Public Welfare* § 417 [(2015)]. The claimant must show that the reason for voluntary termination was of a necessitous and compelling nature. *Id.* Basically, circumstances causing the voluntary termination must be "real, substantial, and reasonable, and which would compel a reasonable person under similar circumstances to act in the same manner. *Id.* For example, "intentional harassment by a supervisor may constitute good cause" to voluntarily leave employment. [*Kowalski v. Dir. Of Div. of Emp. Sec.*, 460 N.E.2d 1042, 1043 (Mass. 1984)]. However, a claimant must take measures to resolve the problem before quitting, unless such measures would only be futile gesture. *See id.* ("[T]he claimant has the burden of proving a reasonable attempt to correct those conditions of employment which [s]he now claims justified [her] leaving [the] employment, unless [s]he can show that such an attempt would have been futile."); [*s*]*ee also* 76

Am. Jur. 2d *Unemployment Compensation* § 104 [(2016)].

Geohaghan moved for reconsideration of the ALC's order, arguing the ALC failed to rule on her argument that she had good cause to resign as a matter of law and applied the incorrect standard of review. She asserted the ALC should have applied a de novo standard of review to the question of whether she had good cause to resign because it was a question of law. Geohaghan further asserted, "threats of violence and a reasonable fear of bodily harm have repeatedly been held to constitute good cause to resign as a matter of law." She asked that the ALC either find she had good cause to resign as a matter of law, or in the alternative, apply a de novo standard of review and find she had good cause to resign. Geohaghan also argued the ALC improperly substituted its judgment on questions of fact.

In its order denying Geohaghan's motion for rehearing, the ALC explained it refrained from addressing Geohaghan's argument that whether she had good cause to resign from her employment was a matter of law and that the ALC erred by failing to employ a de novo standard of review because such argument was without merit. Citing to *Stone* and 81 C.J.S. *Social Security and Public Welfare* § 417, the ALC found the meaning of good cause as used in section 41-35-120(1) had already been established, and thus, the Appellate Panel need only make factual findings regarding the existence of good cause. The ALC further found that South Carolina appellate courts had consistently treated the question of whether an employee had good cause to resign as a question of fact, citing *Sviland v. South Carolina Emp. Sec. Comm'n*, 300 S.C. 305, 387 S.E.2d 688 (Ct. App. 1989). As to its finding that "[DSS] policy did not require its case workers to conduct monthly visits with clients if they feel threatened," the ALC acknowledged the Appellate Panel did not make such a finding but held the hearing testimony supported its finding as permitted under SCALC Rule 40.[4] This appeal followed.

**ISSUES ON APPEAL**

1. Did the ALC err in holding that whether Geohaghan had good cause to resign was a question of fact subject to substantial evidence review?

---

[4] Rule 40 provides, "The administrative law judge may affirm any ruling, order or judgment upon any ground(s) appearing in the Record and need not address a point which is manifestly without merit."

2.  Did the ALC err in affirming the Department's finding that Geohaghan resigned without good cause when the ALC's findings were not supported by substantial evidence?

## STANDARD OF REVIEW

> The review of the administrative law judge's order must be confined to the record.  The court may not substitute its judgment for the judgment of the administrative law judge as to the weight of the evidence on questions of fact.  The court of appeals may affirm the decision or remand the case for further proceedings; or, it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:
>
> (a) in violation of constitutional or statutory provisions;
>
> (b) in excess of the statutory authority of the agency;
>
> (c) made upon unlawful procedure;
>
> (d) affected by other error of law;
>
> (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C. Code Ann. § 1-23-610(B) (Supp. 2022).

"[T]his Court's review is limited to determining whether the ALC's findings were supported by substantial evidence or were controlled by an error of law." *Engaging & Guarding Laurens Cnty.'s Env't v. S.C. Dep't of Health & Env't Control*, 407 S.C. 334, 341, 755 S.E.2d 444, 448 (2014).  "Questions of statutory interpretation are questions of law, which we are free to decide without any deference to the court below."  *CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011).  "The [c]ourt may not substitute its judgment

for the ALC's judgment as to the weight of the evidence on questions of fact." *Engaging & Guarding Laurens Cnty.'s Env't*, 407 S.C. at 342, 755 S.E.2d at 448. "In determining whether the ALC's decision was supported by substantial evidence, this court need only find that, upon looking at the entire record on appeal, there is evidence from which reasonable minds could reach the same conclusion that the ALC reached." *Id.*

## LAW AND ANALYSIS

### I.    ALC Review Standard

Geohaghan first argues the ALC erred in holding that whether she had good cause to resign was a question of fact subject to substantial evidence review. She asserts binding precedent holds the meaning of the term "good cause" as used in section 41-35-120(1) is a question of law; even if the meaning of good cause has been defined by South Carolina case law such that it has become a question of fact, this is only true in a limited context not applicable to this case; and, South Carolina courts have not consistently treated the meaning of good cause as a question of fact. We disagree.

"Judicial review of disputes arising from the [Department] is governed by the Administrative Procedures Act (APA)." *Nucor Corp. v. S.C. Dep't of Emp. & Workforce*, 410 S.C. 507, 514, 765 S.E.2d 558, 562 (2014). Section 1-23-380(4) to (5) of the South Carolina Code (Supp. 2022) applies the same standard to the ALC's review of agency decisions as the review standard set forth in section 1-23-610(B).

> An insured worker is ineligible for benefits for . . . [l]eaving work voluntarily. If the department finds he left voluntarily, *without good cause*, his most recent work prior to filing a request for determination of insured status or a request for initiation of a claim series within an established benefit year, with ineligibility beginning with the effective date of the request and continuing until he has secured employment and shows to the satisfaction of the department that he has performed services in employment as defined by Chapters 27 through 41 of this title and earned wages for those services equal to at least eight times the weekly benefit amount of his claim.

§ 41-35-120(1) (emphasis added).

In her appeal to the ALC, Geohaghan failed to directly challenge the Department's definition of good cause as used in section 41-35-120(1), and therefore, we hold the Department's definition is the law of the case. *See Dreher v. S.C. Dep't of Health & Env't Control*, 412 S.C. 244, 249, 772 S.E.2d 505, 508 (2015) ("An unappealed ruling is the law of the case and requires affirmance." (quoting *Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 573, 743 S.E.2d 778, 785 (2013))); *id.* at 250, 772 S.E.2d at 508 ("Thus, should the appealing party fail to raise all of the grounds upon which a lower court's decision was based, those unappealed findings—whether correct or not—become the law of the case."). In her ALC brief, Geohaghan included a paragraph in her argument section addressing the meaning of good cause under section 41-35-120(1), including a citation to 76 Am. Jur. 2d *Unemployment Compensation* § 102 (2005) that read, "To constitute good cause, the circumstances which lead an employee to leave the job must be such as would cause a reasonable person to leave." She also included a citation to *Stone* to support the proposition that "[g]ood cause to leave must, generally, be attributable to or connected with the claimant's employment." Geohaghan argued, "Here, it is undisputed that the events which caused [her] to resign were attributable to or connected with her employment at DSS. *Therefore, the question presented in this case is whether* [*her*] *decision to resign in lieu of placing her life in jeopardy was reasonable*." (emphasis added). Geohaghan further argued the Department's finding that her decision to resign was unreasonable "misapplied the good cause standard contained in [section] 41-35-120(1)." We conclude this argument did not raise a challenge to the Department's definition of good cause because she framed the issue as one of reasonableness. Further, she failed to challenge the Department's definition of good cause in her motion to reconsider. Rather, she argued the ALC should have applied a de novo standard of review to the question of whether she had good cause to resign because it was a question of law. Geohaghan further asserted, "threats of violence and a reasonable fear of bodily harm have repeatedly been held to constitute good cause to resign as a matter of law." As such, we find Geohaghan still did not challenge the Department's definition of good cause in her motion to reconsider.

Furthermore, Geohaghan does not challenge the Department's or the ALC's definition of good cause on appeal. Instead, she argues *Stone* does not adequately define good cause for purposes of her case and the ALC therefore should have applied a de novo standard of review in determining whether the legislature intended the meaning of good cause to include a justified fear for one's safety that

is connected with the employment. Although Geohaghan argues the term good cause as used in section 41-35-120(1) is ambiguous and therefore requires this court to the apply the rules of statutory construction, she does not argue the Department or the ALC incorrectly defined good cause. Based on the foregoing, we hold the Department's definition of good cause is the law of the case.

Because Geohaghan failed to appeal the Department's definition of good cause to the ALC, we hold the ALC properly applied the substantial evidence standard in reviewing the Department's decision. *See Boggero v. S.C. Dep't of Revenue*, 414 S.C. 277, 280, 777 S.E.2d 842, 843 (Ct. App. 2015) ("Certain situations involve a mixed question of law and fact." (quoting *Hopper v. Terry Hunt Constr.*, 373 S.C. 475, 479, 646 S.E.2d 162, 165 (Ct. App. 2007), *aff'd*, 383 S.C. 310, 680 S.E.2d 1 (2009))); *id.* ("For example, '[s]tatutory interpretation is a question of law.'" (alteration in original) (quoting *Hopper*, 373 S.C. at 479, 646 S.E.2d at 165)); *id.* ("But whether the facts of a case were correctly applied to a statute is a question of fact, subject to the substantial evidence standard." (quoting *Hopper*, 373 S.C. at 479, 646 S.E.2d at 165)). The ALC was free to determine whether substantial evidence supported the Department's decision without the need to interpret the meaning of good cause as used in section 41-35-120(1). We note the Department's definition and the ALC's definition were not identical—the ALC's definition included an additional requirement that the claimant take measures to resolve the problem before resigning, unless such measures would be futile. Nevertheless, both definitions incorporated our supreme court's holding in *Stone* and established a reasonableness standard in determining whether an employee had good cause to terminate their employment. While we agree with Geohaghan's argument that *Stone* did not adequately define good cause for purposes of her case, we find her assertion that this alone meant the ALC was required to review the Department's decision under a de novo standard of review is unpersuasive when she failed to challenge the Department's or the ALC's definitions of good cause. Based on the foregoing, we hold the ALC did not err in applying a substantial evidence standard of review because Geohaghan failed to challenge the Department's definition of good cause in her appeal to the ALC.

## II.     Substantial Evidence in Support of the ALC's findings

In the alternative, Geohaghan argues the ALC erred in affirming the Department's finding she resigned without good cause because the ALC's findings were not supported by substantial evidence. We disagree.

Applying the Department's definition of good cause under section 41-35-120(1), we hold the ALC did not err in affirming the Department's determination that Geohaghan resigned without good cause when substantial evidence supports the Department's factual findings. *See Milliken & Co. v. S.C. Emp. Sec. Comm'n*, 321 S.C. 349, 350, 468 S.E.2d 638, 639 (1996) ("It is well-settled that decisions of administrative agencies should be upheld on appeal where they are supported by substantial evidence."); *Anderson v. Baptist Med. Ctr.*, 343 S.C. 487, 492, 541 S.E.2d 526, 528 (2001) ("Substantial evidence is not a mere scintilla of evidence, but evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the agency reached."). We address each of Geohaghan's arguments in turn.

First, we reject Geohaghan's contention that the Department's finding that the nature of her job had not changed was irrelevant under the definition of good cause in *Stone*. The Department's definition included language addressing "a material, substantial change in the conditions of employment." Thus, this fact was relevant to the Department's decision.

Second, the Department's finding that Geohaghan's job was not in jeopardy was likewise relevant in the application of the Department's definition and supported by substantial evidence. At the evidentiary hearing, Geohaghan testified that at the time of her resignation, she had not been penalized for failing to meet with the Client after the January 31 incident and acknowledged she would have still been employed had she not resigned. Geohaghan merely speculated that she might have been penalized for not meeting with the Client but confirmed she was not instructed to meet with the Client. In addition, Brown testified that as a supervisor, she would not require her staff to conduct monthly visits if they were threatened. Foulks testified Geohaghan would have been held accountable for meeting with the Client only if a plan assisting Geohaghan had already been implemented. However, Foulks did not know whether a plan had ever been put in place for Geohaghan. We find the foregoing constitutes substantial evidence to support the ALC's finding Geohaghan's job was not in jeopardy.

Third, substantial evidence contradicts Geohaghan's claim that it was merely "fortuitous" she was not confronted by the Client after the January 31 incident. In her letter to the Appeal Tribunal, Geohaghan stated Breeland told her "to not follow '[the Client] up.'" She testified security told her the Client would not be allowed on DSS premises for the time being and she was not instructed to meet with the Client nor was she penalized for not doing so. In addition, Brown confirmed the Client would not be allowed on DSS premises until DSS completed

its investigation. Although DSS did not complete its investigation until after Geohaghan's resignation, the outcome of that investigation resulted in the Client being served with a notice of no trespassing. As to the Department's alleged mischaracterization of her delay in resigning, we find Geohaghan's assertion she was actively engaged with DSS to address the threat is without evidentiary support. The incident involving the Client occurred on January 31, 2018, and Geohaghan resigned on March 2, 2018. The only actions she took to address her concerns before she resigned were discussing her concerns with Breeland and sending an email to Brown on February 12, 2018. We find this constitutes substantial evidence to support the Department's finding Geohaghan waited only a month to resign after the January 31 incident.

Fourth, substantial evidence supports the Department's finding Geohaghan failed to report her concerns up the chain of command in order to seek a quicker resolution when DSS failed to respond to her concerns. By her own admission, Geohaghan did not contact Brown or HR after her February 12 email to Breeland and she failed to contact state level HR or the state office, even though she knew who she could have contacted at the state office. Brown testified Geohaghan could have submitted an agency complaint, which would have required Geohaghan to go through her chain of command. Foulks added that had Geohaghan reached out to her, she could have facilitated the implementation of a plan to address her concerns. Accordingly, we find substantial evidence supports the Department's finding Geohaghan failed to report her concerns up the chain of command.

Fifth, as to the Department's finding Geohaghan failed to avail herself of the measures DSS could have put in place to ensure her safety, we find substantial evidence supports this finding. Initially, we note the Department considered the ways in which *Geohaghan* failed to take steps to address her concerns, not whether *DSS* failed to act independently to implement safety measures to address her concerns. Foulks testified she could have provided several services to Geohaghan, including additional training, pairing her with another employee to handle the Client's case, or reassignment of the case. Foulks explained, however, that DSS would have determined a specific course of action on a case-by-case basis. Accordingly, we find substantial evidence supports the Department's finding Geohaghan failed to take adequate steps to address her concerns.

Further, as to Geohaghan's argument the ALC erred in finding DSS took meaningful or timely steps to ensure her safety, we find substantial evidence supports this finding. The record contains no evidence showing the time frame within which DSS was required to complete its investigation. Brown testified she

followed all the proper protocols in gathering the witness statements but she did not give the time frame in which she was required to provide them to the critical response office.  Moreover, Brown confirmed the Client would not be allowed on DSS premises during the pendency of DSS's investigation of the January 31 incident.  In addition, Breeland told Geohaghan "to not follow '[the Client] up'" after the incident.  We find the foregoing constitutes substantial evidence of DSS's meaningful and timely steps to ensure Geohaghan's safety.

Finally, as to her argument that the ALC erred in finding DSS policy did not require case workers to make monthly visits with clients if they felt threatened when the Department did not make such a finding, we find Geohaghan misconstrues our supreme court's holding in *Grant v. South Carolina Coastal Council*.  *See* 319 S.C. 348, 353, 461 S.E.2d 388, 391 (1995) (holding "neither [an appellate court] nor the [ALC] may substitute [its] judgment for that of the agency as to the weight of the evidence on questions of fact").  "[T]he ALC, sitting in its appellate capacity, may not make its own factual findings."  *Stubbs v. S.C. Dep't of Emp. & Workforce*, 407 S.C. 288, 292, 755 S.E.2d 114, 116 (Ct. App. 2014).  "This court cannot substitute its judgment for that of an administrative agency when the agency's factual findings [are] supported by substantial evidence . . . ."  *Todd's Ice Cream, Inc. v. S.C. Emp. Sec. Comm'n*, 281 S.C. 254, 259, 315 S.E.2d 373, 376 (Ct. App. 1984).  In its order denying rehearing, the ALC acknowledged the Appellate Panel did not make this specific finding; however, the ALC reasoned SCALC Rule 40 permitted it to rely on any evidence appearing in the record in its review of the Appellate Panel's decision.  The ALC's finding did not amount to "judicial fact-finding"; rather, it constituted evidence the ALC considered under its substantial evidence review.  *See Todd's Ice Cream, Inc.* 281 S.C. at 258, 315 S.E.2d at 375 ("The substantial evidence rule does not allow judicial fact-finding, or the substitution of judicial judgment for agency judgment."); SCALC Rule 40 ("The administrative law judge may affirm any ruling, order or judgment upon any ground(s) appearing in the Record and need not address a point which is manifestly without merit.").

Based on the foregoing, we hold substantial evidence supported the ALC's affirmation of the Department's finding that Geohaghan lacked good cause to resign.

**CONCLUSION**

For the foregoing reasons, we affirm the ALC's order affirming the Department's final decision determining Geohaghan was indefinitely ineligible for receipt of unemployment benefits.

**AFFIRMED.**

**WILLIAMS, C.J., and KONDUROS, J., concur.**